# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OLGA E. SALGADO, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Civil Action No. 07-170 Erie |
| ED SHULTS OF WARREN, INC., | ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District Judge.

Pending before the Court is the Plaintiff's renewed motion for judgment notwithstanding the verdict or in the alternative for a new trial. ECF No. 65; FED. R. CIV. P. 50(b); FED. R. CIV. P. 59(a). In this case, the Plaintiff contended that she suffered serious injuries when she was struck by a vehicle operated by an employee of Ed Shults of Warren, Inc. ("Ed Shults") while standing in its parking lot. The case was tried to a jury between September 1, 2010 and September 7, 2010. Special Interrogatories were submitted to the jury. The jury concluded that the Plaintiff had proven by a preponderance of the evidence that Ed Shults, by virtue of the conduct of its agent, was negligent, but further concluded that the Plaintiff had failed to prove that the Defendant's negligence was a "factual cause in bringing about her injury."

For the reasons that follow, the Court will deny the motion for judgment as a matter of law and grant the Plaintiff's motion for a new trial.

## I. TRIAL RECORD

Plaintiff Olga E. Salgado ("Salgado"), a citizen and domiciliary of New York, was employed by Enterprise Rent-A-Car ("Enterprise") from January 5, 2004, through January 2, 2008. ECF No. 72-1 at 48; ECF No. 73 at 19. As an Enterprise employee, Salgado was required to travel to different destinations in order to accommodate the needs of individuals who needed to rent vehicles. ECF No. 72-1 at 48-49. Defendant Ed Shults of Warren, Inc. ("Ed Shults"), is a business entity located in Warren, Pennsylvania. ECF No. 1 at ¶ 1. Ed Shults engages in the business of repairing damaged vehicles.

1

At around 4:00 P.M. on July 26, 2005, Salgado traveled to the business premises of Ed Shults in order to deliver a Ford Expedition to a customer whose own vehicle was being serviced by Ed Shults personnel. ECF No. 72-2 at 1-3. She parked the Ford Expedition next to Ed Shults' service entrance and entered its office. ECF No. 72-2 at 5-7. The customer informed Salgado that she needed to retrieve some of her personal belongings from her vehicle. Salgado followed the customer outside for the purpose of familiarizing her with the features of the Ford Expedition vehicle. ECF No. 72-2 at 7. Salgado stood behind a parked Oldsmobile Bravada as she waited for the customer to move her belongings into the Ford Expedition. *Id.* The Oldsmobile Bravada was missing an outside mirror on the driver's side. Tr. at 81. Samuel Baughman ("Baughman"), a mechanic employed by Ed Shults, was instructed to put a new outside mirror on the driver's side of the Oldsmobile Bravada. ECF No. 72-1 at 31. Baughman entered the Bravada, placed it in reverse, and began to back up in order to move it to an area where the missing mirror could be replaced. *Id.* As he was so doing, the rear end of the Bravada struck Salgado on the buttocks and knocked her to the ground. ECF No. 72-1 at 32; ECF No. 72-2 at 11. Baughman stopped moving the vehicle once he realized that Salgado had been hit. ECF No. 72-1 at 32.

Ed Shults personnel raised Salgado to her feet and placed her in a wheelchair. ECF No. 72-2 at 11. Salgado was later moved into the office. Shortly thereafter, an ambulance arrived and transported Salgado to Warren General Hospital. ECF No. 72-2 at 11-12. Her neck was immobilized by a collar during the trip to the hospital. ECF No. 72-2 at 12. Salgado was released from the hospital later that day, after undergoing a series of x-rays and computed tomography ("CT") scans. *Id.* She was provided with medications to ease her pain and instructed to seek follow-up care with her primary care physician. ECF No. 72-2 at 12-13. Salgado did not return to work until October 2005. ECF No. 72-2 at 15. She received medical treatment from Dr. Randall Swanson, an orthopedic surgeon, during the intervening period of time.[1] *Id.*

Subsequent treatment failed to fully alleviate Salgado's pain. Salgado's chiropractor referred her to Dr. James Egnatchik, a neurosurgeon. ECF No. 72-2 at 18. Dr. Egnatchik first examined Salgado in March 2006. ECF No. 73-2 at 13. Salgado complained of pain in her

---

[1] Salgado testified that she could not remember whether Dr. Swanson was the physician who had cleared her to return to work in October 2005. ECF No. 72-2 at 15.

lower back that was radiating into her left leg.  ECF No. 73-2 at 15.  She attributed this pain to injuries resulting from the accident.  ECF No. 73-2 at 14-15.  A magnetic resonance imaging ("MRI") scan revealed that Salgado had an osteophyte (*i.e.*, a bone spur) pressing against a nerve in her back.  ECF No. 73-2 at 17.

Salgado returned to Dr. Egnatchik's office in September 2006.  ECF No. 73-2 at 19.  After conducting a discogram, Dr. Egnatchik determined that Salgado would be a good candidate for a foraminotomy.  ECF No. 73-2 at 20.  The procedure was performed on October 17, 2006.  ECF No. 73-2 at 21.  Dr. Egnatchik testified that the objective of the foraminotomy had been to decompress the osteophyte that had been pressing against a nerve in Salgado's lumbar spine.  ECF No. 73-2 at 17.  He further explained that Salgado's lumbar spine had been fractured and that the osteophyte had formed while the fracture was healing.  ECF No. 73-2 at 17-18.  A month after the surgery, Salgado reported that the pain in her leg had decreased by 50%.  ECF No. 73-2 at 21.  She did not work in the immediate aftermath of the surgery.  *Id.*

On January 24, 2007, Dr. Egnatchik cleared Salgado to return to work on the condition that she not engage in any "car prepping."  ECF No. 73-2 at 21-22.  Salgado was told to return in three months for a follow-up appointment.  ECF No. 73-2 at 22.  When Salgado returned to Dr. Egnatchik's office on April 26, 2007, she was instructed to attend physical therapy sessions two to three times per week.  ECF No. 73-2 at 22.

Salgado continued to receive treatment from Dr. Egnatchik.  On July 20, 2007, she expressed the view that her physical therapy sessions had caused her condition to worsen.  ECF No. 73-2 at 23.  Although Salgado had prescriptions for Lortab and Flexeril, she was only taking them at night because taking them during the day would inhibit her ability to function at work.  *Id.*  An MRI scan was conducted to rule out infections.  ECF No. 73-2 at 24.  The scan revealed that Salgado had experienced degenerative changes.  *Id.*

An epidural steroid injection was administered to Salgado's back in September 2007.  ECF No. 73-2 at 24-25.  The injection did not improve her condition.  *Id.*  On October 8, 2007, Salgado stated that her pain had actually increased in the immediate aftermath of the injection.  ECF No. 73-2 at 25-26.  Dr. Egnatchik recommended that Salgado stop working, and she followed his advice.  ECF No. 72-2 at 24-26.  Enterprise terminated Salgado's employment on January 2, 2008, because it could no longer hold her job open.  ECF No. 73 at 19.

3

A discogram performed on Salgado in May 2008 revealed that she was suffering from annular tears in some of her discs and other abnormalities in her facet joints. ECF No. 73-2 at 27. At Dr. Egnatchik's direction, Salgado underwent a lumbar fusion and decompressive laminectomy on August 22, 2008. ECF No. 73-2 at 28. During the course of the surgery, Dr. Egnatchik discovered that the nerves on both sides of Salgado's spine were under pressure from a significant form of stenosis. *Id.* The laminectomy was designed to relieve that pressure. *Id.* Staples and stitches were removed from Salgado's skin on September 3, 2008. ECF No. 73-2 at 30. One week later, Salgado was able to ambulate with the assistance of a walker. *Id.*

Salgado returned to Dr. Egnatchik's office for a follow-up appointment on November 10, 2008. ECF No. 73-2 at 31. Although Salgado continued to experience some pain in her lower back and left leg, she informed Dr. Egnatchik that the surgery had improved her condition. *Id.* She was given Valium to relax her muscles and Percocet to control her pain. *Id.* Dr. Egnatchik observed that Salgado's spinal bones were "maturing" and that no signs of "instrumentation failure" were present. *Id.* As of February 10, 2009, Salgado was still experiencing discomfort and stiffness in her back. *Id.* Nonetheless, she was able to walk without the assistance of a cane or crutch. ECF No. 73-2 at 31-32.

X-rays of Salgado's back taken on November 12, 2009, revealed that her recovery from surgery was proceeding in a normal manner, and that no evidence of "instrumentation failure" was present. ECF No. 73-2 at 32-33. Nevertheless, Salgado continued to complain of chronic pain in her lower back and "numbness and tingling" in her left leg. ECF No. 73-2 at 32-33. Dr. Egnatchik recommended that Salgado undergo another MRI scan. ECF No. 73-2 at 34.

The MRI scan recommended by Dr. Egnatchik was conducted in March 2010. ECF No. 73-2 at 34. The scan revealed that Salgado's bones and screws were in place, and that no infections were present. ECF No. 73-2 at 34-35. At that time, Salgado asked Dr. Egnatchik for permission to return to work, as she had secured a position as a Spanish-speaking typist for the Chautauqua County Department of Social Services ("Department"). ECF No. 72-2 at 35-36. Dr. Egnatchik cleared Salgado to work, based on his understanding that she would be afforded an opportunity to sit or stand as needed. ECF No. 72-2 at 39. Her employment with the Department commenced on April 1, 2010. ECF No. 72-2 at 39.

After working for approximately one month, Salgado started to feel a "pinching motion" in her lower back. ECF No. 72-2 at 39-40. She returned to Dr. Egnatchik's office on June 17,

4

2010. ECF No. 72-2 at 40; ECF No. 73-2 at 35. An epidural steroid injection was administered to Salgado's back. *Id.* Her pain worsened during the next three to four days. ECF No. 72-2 at 40. Dr. Egnatchik recommended that she stop working. ECF No. 72-2 at 41. She ceased working as of June 23, 2010. ECF No. 73 at 46.

Dr. Egnatchik examined Salgado on August 19, 2010. ECF No. 73-2 at 35. Salgado told him that she would suffer for several days whenever she tried to engage in activities that were physically demanding. ECF No. 73-2 at 35-36. Dr. Egnatchik concluded that Salgado was 75% disabled, which meant that her employability was "severely impaired." ECF No. 73-2 at 45. He also testified that she sustained her injury at work.[2] ECF No. 73-2 at 148.

Howard Feldt ("Feldt"), who was employed as a service manager for Ed Shults at the time of the accident, saw the Oldsmobile Bravada strike Salgado. ECF No. 72-1 at 2. He testified that Salgado had been standing about eight feet behind the vehicle, with her back to the vehicle, when Baughman started to move it. *Id.* Feldt further stated that the Oldsmobile Bravada had "grazed" the back of Salgado's leg, causing her to fall to her knees. ECF No. 72-1 at 4. He asserted that Salgado had fallen face-first before rolling onto her buttocks. ECF No. 72-1 at 5. When asked how fast the Oldsmobile Bravada had been moving at the time of impact, Feldt testified that it had been "crawling" very slowly, since Baughman had been trying to back it out of a "tight spot." ECF No. 72-1 at 12. Feldt stated that the impact had "startled" Salgado, causing her to fall to the ground. ECF No. 72-1 at 6. He indicated that Salgado had not spent a lot of time on the ground, and that she had immediately risen to her feet after falling, albeit with the assistance of Ed Shults personnel. *Id.* Feldt testified that Salgado had complained of dizziness after entering the office, and that she had responded in the affirmative when asked whether an ambulance should be called. ECF No. 72-1 at 6-7.

Michael Farren ("Farren") was employed by Ed Shults as an assistant service manager at the time of the incident. ECF No. 72-1 at 24. Although Farren did not witness the collision, he

---

[2] Salgado's numerous medical records were marked and admitted. ECF 64. However, in response to an inquiry from the Court, Salgado's counsel asked that they not be sent out with the jury:

> MR. YORK: My sense at this point is the medical records have been gone over in the testimony fairly extensively. And so I don't see the need to actually physically put them into evidence.
> THE COURT: All right.

ECF No. 74 at 8.

testified that he had seen Salgado sitting on her buttocks after being struck by the Oldsmobile Bravada. ECF No. 72-1 at 27. He could not remember whether Salgado had complained of pain after being hit. ECF No. 72-1 at 29.

Baughman testified that he had "felt a bump" while backing up the Oldsmobile Bravada, causing him to stop "immediately." ECF No. 72-1 at 32. Baughman stated that the vehicle had been moving very slowly at the time of impact. ECF No. 72-1 at 38. He explained that Salgado had been "slow to get up" after the incident. ECF No. 72-1 at 41.

Salgado testified that the Oldsmobile Bravada had struck her on the buttocks, causing her waist to move forward and her head to snap back. ECF No. 72-2 at 11. She stated that the back of her head had hit the vehicle. *Id.* Salgado asserted that she had experienced pain in her lower back, head and shoulders while being transported to Warren General Hospital. ECF No. 72-2 at 12. She attributed her shoulder pain to the fact that she had used her hands to break her fall after being knocked to the ground. *Id.* Salgado testified that while physical therapy had alleviated the pain in her neck and shoulders, it had not significantly reduced the pain in her lower back and left leg. ECF No. 72-2 at 17-18. She further claimed that she had never experienced prolonged pain or discomfort in her lower back or left leg prior to the accident. ECF No. 72-2 at 18.

Lorie Reynolds ("Reynolds") was employed by Enterprise as an assistant manager on July 26, 2005. ECF No. 73-1 at 23. She drove to Ed Shults' premises shortly after learning that Salgado had been injured. ECF No. 73-1 at 25. Reynolds testified that she had spoken with Feldt after arriving on the scene, and that he had stated that the collision had knocked Salgado "out of her shoes" and caused her to fly "about five feet." ECF No. 73-1 at 26. She claimed that Feldt had been "shaken up" in the immediate aftermath of the incident. ECF No. 73-1 at 28. Reynolds also testified that she had never heard Salgado complain of back pain prior to July 26, 2005. ECF No. 73-1 at 25.

Salgado's father, Feliciano Salgado ("Feliciano"), and her daughter, Rachel Salgado ("Rachel") also testified at trial. Feliciano attributed Salgado's pain to injuries resulting from the accident. ECF No. 73-1 at 31. Rachel testified that, in the aftermath of the accident, Salgado had been unable to sit through violin recitals and sporting events that she had previously attended on a regular basis. ECF No. 73-1 at 39-42. Rachel further explained that the incident had rendered Salgado incapable of sitting on bleachers for prolonged periods of time. ECF No. 73-1 at 40.

6

Dr. Daniel V. Loesch performed an independent medical examination of Salgado on February 17, 2010 and was called to testify as an expert by Ed Shults. ECF No. 73-3 at 16. The examination led Dr. Loesch to believe that Salgado's pain was attributable to a "work-related injury." ECF No. 73-3 at 43. He testified that, during the course of the examination, Salgado had exhibited facial expressions of discomfort before doing anything that could be expected to cause physical pain. ECF No. 73-3 at 18. He further opined that there had been a "psychological component" to Salgado's distress, and that there had been "non-physical causes for the degree of pain that she was experiencing." ECF No. 73-3 at 18, 20. Dr. Loesch explained that while he had believed Salgado to be capable of performing sedentary work for only four hours per day after completing the examination, he had changed his mind after viewing surveillance tapes depicting some of Salgado's daily activities during the summer of 2010. ECF No. 73-3 at 23-24. He stated that the tapes had depicted Salgado engaging in activities that had appeared to be in excess of her capabilities at the time of the examination, leading him to believe that she was able to perform sedentary work for six to eight hours per day. *Id.* Dr. Loesch responded in the affirmative when asked whether he believed Salgado to be capable of performing the duties of her position with the Department. ECF No. 73-3 at 25.

Before the case was submitted to the jury, Salgado moved for a judgment as a matter of law on the issue of Ed Shults' liability. ECF No. 74-1 at 31. The Court determined that the issue should be decided by the jury and denied the motion. ECF No. 74-1 at 43. As previously stated, the jury concluded that Ed Shults had been negligent, but that this negligence had not been a factual cause of Salgado's injuries. ECF No. 61. Salgado orally moved for a judgment notwithstanding the verdict, contending that the jury's finding as to causation was lacking in evidentiary support. ECF No. 75-1 at 36. She was instructed to submit her motion in writing. *Id.* On September 16, 2010, Salgado filed a renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) and an alternative motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a)(1)(A). ECF No. 65. The matter is now ripe for disposition.

**II.    STANDARD OF REVIEW**

A motion for judgment as a matter of law can be granted upon a showing that the jury did not have "a legally sufficient evidentiary basis" for rendering a verdict against the moving party. FED. R. CIV. P. 50(a)(1). A court entertaining a motion for judgment as a matter of law must

view the evidence in the light most favorable to the verdict winner. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3rd Cir. 1993). The party opposing such a motion must be afforded "the benefit of all logical inferences that could be drawn from the evidence presented." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1348 (3rd Cir. 1991). In order to obtain a judgment as a matter of law, the moving party must demonstrate that "the facts are sufficiently clear that the law requires a particular result." *Weisgram v. Marley Co.*, 528 U.S. 440, 448, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000), quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2521, p. 240 (2d ed. 1995).

Generally, the decision whether or not to grant a new trial "is committed to the sound discretion of the district court." *Bonjorno v. Kaiser Aluminum & Chem. Corp.,* 752 F.2d 802, 812 (3rd Cir. 1984). The court's latitude varies however, depending on the type of error alleged. *Klein v. Hollings*, 992 F.2d 1285, 1289-90 (3rd Cir. 1993). Its latitude "is broad when the reason for interfering with the jury verdict is a ruling on a matter that initially rested within the discretion of the court," such as evidentiary rulings. *Id*. The court's discretion is more limited when granting a new trial on the basis that the jury's verdict is against the weight of the evidence; in such cases a new trial should be awarded "only when the record shows that the jury's verdict resulted in a miscarriage of justice or then the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3rd Cir. 1991); *see also Delli Santi v. CNA Ins. Cos.*, 88 F.3d 192, 201 (3rd Cir. 1996); *Roebuck v. Drexel Univ.*, 852 F.2d 715, 735-36 (3rd Cir. 1988). A new trial may not be granted merely "because the evidence was sharply in conflict, because the jury could have drawn different inferences or conclusions, or because another result is more reasonable." *Shushereba v. R.B. Indus., Inc.*, 104 F.R.D. 524, 527 (W.D.Pa. 1985). Moreover, a verdict may not be set aside when it is plausible or when it has a rational basis. *See Delli Santi*, 88 F.3d at 202. According to the Third Circuit, "[t]his limit upon the district court's power to grant a new trial seeks to ensure that a district court does not substitute its 'judgment of the facts and the credibility of witnesses for that of the jury,'" so as to effect a denigration of the jury system. *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 211 (3rd Cir. 1992) (citation omitted).

### III. DISCUSSION

The central issue is whether a new trial should be granted based upon the jury's conclusion that the negligent conduct of Ed Shults was not a factual cause of Salgado's injury.

8

Before the case was submitted to the jury, the Court provided the jury with instructions relating to the issue of factual causation.[3] ECF No. 75-1 at 11-14. A review of the record reveals an absence of any evidentiary basis to support the jury's conclusion that Ed Shults' negligence was not the cause of Salgado's injury. It was undisputed that Salgado was struck by the vehicle and knocked to the ground. Thereafter, as detailed by Dr. Egnatchik, a long period of medical treatment ensued. In addition to Dr. Egnatchik, even Dr. Loesch, Ed Shults' expert, concluded that Salgado's back, neck, arm and leg pain was attributable to the work related accident. ECF No. 16-1 at 11. He expressed the view, however, that Salgado had not been harmed to the degree that she claimed. ECF No. 73-3 at 12-25. Although Dr. Loesch acknowledged that Salgado was experiencing back discomfort, he opined that there was a "psychological element" to her pain. ECF No. 73-3 at 33. He concluded, however, that he did not believe that Salgado had been "faking or malingering" during the course of his examination. ECF No. 73-4 at 2. Dr. Loesch simply opined that Salgado's pain was a partially "psychological" (rather than a purely "physical") consequence of the accident. ECF No. 73-4 at 2-3.

It is also worth noting that Salgado testified that her medical expenses had been paid by her employer's workers' compensation carrier. ECF No. 73 at 32. Further, the parties stipulated that the "reasonable and necessary" medical expenses incurred by Salgado had amounted to $72,373.74. ECF No. 75-1 at 16. The jury was instructed, with the agreement of both counsel, that under New York law, Salgado would be required to reimburse the compensation carrier out of any sum awarded to her in the case. ECF No. 75-1 at 16-17.

Fundamentally, while the extent, nature, and severity of Salgado's injuries where sharply disputed at trial, there was no evidence to support the jury's conclusion that she had sustained no

---

[3] The jury was instructed as follows:

> If you find that the defendant was negligent, in order for the plaintiff to recover in this case, the defendant's negligent conduct must have been a factual cause in bringing about the harm. Conduct is the factual cause of harm when the harm would not have occurred absent the conduct. To be a factual cause, the conduct must have been an actual, real factor in causing the harm, even if the result is unusual or unexpected. A factual cause cannot be an imaginary or fanciful factor having no connection or only an insignificant connection with the harm.
> To be a factual cause, the defendant's conduct need not be the only factual cause. The fact that some other causes concur with the negligence of the defendant in producing an injury does not relieve the defendant from liability so long as its own negligence is a factual cause of the injury.

ECF No. 75-1 at 13-14.

9

injury that was causally related to the accident. I conclude therefore that a miscarriage of justice would result if the jury verdict were permitted to stand.

The only remaining question is whether judgment as a matter of law should be entered in favor of Salgado and against Ed Shults as to liability. In this regard, Salgado argues that a new trial should be ordered only as to damages. For the reasons that follow, I conclude that the new trial should not be limited to the issue of damages.

Under Pennsylvania law, the burden of establishing a plaintiff's contributory negligence rests with the defendant. *Hanlon v. Sorenson*, 433 A.2d 60, 63 (Pa.Super.Ct. 1981). This burden encompasses "both the negligence of the conduct alleged and the causal relationship of that conduct to the injuries for which damages are sought." *Angelo v. Diamontoni*, 871 A.2d 1276, 1280 (Pa.Super.Ct. 2005). Once that burden has been met, the issue of contributory negligence should ordinarily be submitted to the jury even if the evidence tending to negate a finding of contributory negligence is strong. *Alexander v. University of Pittsburgh Medical Center System*, 185 F.3d 141, 146 (3rd Cir. 1999). In *Callahan v. A. Wishart & Sons Co.*, 76 A.2d 386 (Pa. 1950), the Pennsylvania Supreme Court determined that the issue of contributory negligence was a question for the jury under factual circumstances that were analogous to those described by the witnesses testifying in this case. *Callahan*, 76 A.2d at 388 ("The jury alone should determine where pedestrians have the right to be or walk in safety, even if automobiles and trucks drive upon that area at various times.").

In *Gilpin v. Langan*, 789 F.2d 1034 (3rd Cir. 1986), the United States Court of Appeals for the Third Circuit explained:

> With the advent of comparative negligence, the role of the jury did not diminish but perhaps grew larger. The determination that a plaintiff's negligence amounted to fifty-one percent of the causal conduct and thereby barred recovery, rather than to forty-nine percent, leading only to a reduction of the award, is peculiarly a matter on which reasonable minds may differ. By its nature, the issue is one better resolved by the jury than by the court.

*Gilpin*, 789 F.2d at 1036. Where evidence of contributory negligence exists, a determination as to liability can rarely be made as a matter of law. *Spence v. ESAB Group, Inc.*, 623 F.3d 212, 219-220 (3rd Cir. 2010); *Gilbert v. Consolidated Rail Corp.*, 623 A.2d 873, 876 (Pa.Commw.Ct. 1993). At trial I concluded that the issue of Salgado's contributory negligence was properly for the jury, noting:

> The Pennsylvania law, based upon my review of this issue over the weekend, is that clearly if either party offers any evidence "which alone would justify an inference of contributory negligence, it must go to the jury no matter how strong or pervasive may be countervailing proof." That's <u>Hanlet</u>, 289 Pa.Super. 268. Quoting I think <u>Heverin v. Rozier</u>, 419 Pa. 555. And, for instance, in back-up cases the contributory negligence of an individual that has been hit is routinely considered a jury issue. … Here, as I reflected on this thing over the weekend, in my view the issue of the plaintiff's contributory negligence must be submitted to the jury. Number one, she wasn't hit, for instance, standing in her front yard. Where anyone, where a reasonable person would not reasonably anticipate any need to be particularly vigilant. Here, the evidence shows, I took a closer look at the photographs over the weekend, that one view of the evidence could be that she positions herself in a place in the parking lot where, based upon her prior visits there, could or should reasonably anticipate the movement of traffic, including the movement of traffic backing up. In her testimony, which I had my court reporter run for me, which I read, indicates that she stood to the rear of the vehicle, which she had brought in, which was parked, by the way, in a no parking and what was described by some other witnesses as a pedestrian walkway. She indicated that she was positioned there looking away from where the parked vehicles would have been and in a direction of her client for approximately three to five minutes. In my view, … it's clearly a jury issue as to whether she exercised reasonable care in terms of attentiveness and in terms of her position.

ECF No. 75 at 9-10. For the same reasons previously articulated at trial, I conclude that a new trial is appropriate both as to liability and damages.

## IV. CONCLUSION

For the reasons previously stated, Salgado's renewed motion for judgment as a matter of law is denied and her motion for a new trial will be granted. An appropriate Order follows.

11

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OLGA E. SALGADO, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ED SHULTS OF WARREN, INC., )<br>)<br>Defendant. ) | Civil Action No. 07-170 Erie |

## ORDER

AND NOW, this 9th day of June, 2011, for the reasons set forth in the accompanying Memorandum Opinion, IT IS HEREBY ORDERED that the Plaintiff's Renewed Motion for Judgment as a Matter of Law [ECF No. 65] is DENIED, and that her Alternative Motion for a New Trial [ECF No. 65] is GRANTED.

                                                                  s/ Sean J. McLaughlin
                                                                  United States District Judge

cm: All parties of record.